DECISION.
Defendant-appellant Lisa Dunaway appeals the judgment of the Hamilton County Court of Common Pleas revoking her community control and imposing the maximum term of incarceration. For the reasons set forth below we affirm in part, reverse in part, and remand for resentencing.
In February 2001, Dunaway was indicted on one count of menacing by stalking in violation of R.C. 2903.211(A), a fourth-degree felony. On April 27, 2001, Dunaway pleaded guilty to the charge. On May 31, 2001, following a hearing, the trial court sentenced Dunaway to ten days in the Hamilton County Justice Center and to five years of community control. At the sentencing hearing, and in the judgment entry, the trial court ordered, as an additional condition of community control, that Dunaway have no contact with the male victim, who was a minor, the victim's family, or any children except her own. At that time, the trial court also warned Dunaway that if she violated the conditions of her community control, she could face eighteen months in prison, the maximum sentence for the offense.
Several days after Dunaway was released from the Hamilton County Justice Center, the victim's family notified the Hamilton County Probation Department that Dunaway had appeared three times in two days at locations where family members were present. A community-control-violation charge was filed against Dunaway, to which she pleaded not guilty. A hearing was held on the alleged violation on July 11, 2001.
At the hearing, the state presented testimony from the victim's mother, the victim's sister, and Dunaway's probation officer. The victim's mother testified that on June 9, 2001, she was driving through the parking lot of a local store with her daughter when Dunaway drove up parallel to her car. As Dunaway drove by, both women looked at each other and then drove on. The daughter also testified that she saw Dunaway make eye contact with her mother.
The victim's mother testified that she and her daughter shopped at the store for approximately 20 to 30 minutes. They then drove to a restaurant located across the street. After they were seated, Dunaway came into the restaurant. Dunaway, accompanied by the hostess, walked directly past the booth where the victim's mother and sister were seated. Both women made eye contact. The victim's mother and sister immediately left the restaurant and went home to avoid further contact with Dunaway.
The following day, June 21, 2001, the victim's mother took her daughter and five other children to a local amusement park. The trip had been planned one week earlier, and the original plan was for the victim, now 16, to drive his sister and her friends to the park. The morning of the trip, however, the victim said that he had a headache and did not feel up to driving. So the victim's mother drove instead. The group arrived at the park around 8 a.m.
At about 12:45 or 12:50 p.m., the victim's sister and her friends were standing in line at a ride. The victim's sister testified that she saw Dunaway at the exit ramp to the same ride. She stated that Dunaway walked past her and looked directly at her. When the ride was over, the group went to another location and looked at pictures on a display. The sister testified that she turned around and that Dunaway was standing nearby. Again, Dunaway made eye contact with her.
The victim's sister immediately called her mother for a ride home. The victim's mother testified that when her daughter called, there was panic in her daughter's voice. Her daughter had been frightened at seeing Dunaway. The mother further testified that she called the Hamilton County Probation Department, which instructed her to send her daughter to the guest-relations booth and to notify security personnel of the situation. The victim's father picked up the group shortly thereafter and drove them home.
Dunaway and her oldest son also testified at the hearing. Both denied ever driving through the parking lot at the local store on the day in question. Dunaway testified that she went to the restaurant after completing several errands nearby, but denied seeing any member of the victim's family. Her son testified to the same facts. He also stated that Dunaway had asked him to look for the victims' family car to be sure they were not going to run into them, and that he did not see the car in the restaurant parking lot.
Dunaway admitted to being at the amusement park on the day in question. She testified that she stood at the exit ramp while her sons were on a ride. She said that when her sons left the ride, her oldest son indicated that the victim's sister was in line for the same ride. She said that she immediately walked to another area of the park. She testified that she personally did not see the victim's sister. She further stated that she remained in the park because she did not feel she had to leave as long as she moved to another part of the park. She stated that she stayed in the park to allow her sons to go on more rides and then had dinner at one of the park's restaurants.
As they left the park, Dunaway testified, she decided to report the incident to her probation officer. She said that she called her probation officer from a telephone at the park, but could not hear anything because of the background noise. She then went to her car, but it would not start. After receiving assistance from park employees, she went to a restaurant nearby. While there, she asked for, but was denied, the use of the telephone. Thereafter, she drove home and left a voice-mail message for her probation officer about the incident.
Dunaway's probation officer testified that the victim's mother had telephoned him on June 21, 2001, to report that Dunaway "was at it again." She explained her contacts with Dunaway the prior day. She then told him that her daughter was currently at an amusement park and that she was concerned for her daughter's safety because Dunaway had again appeared in her daughter's presence.
The probation officer further testified that Dunaway had called him on June 18, 2001, and asked for permission to take her sons to the amusement park. He granted her request. He testified that Dunaway had left a message for him around 7 p.m. on June 21, stating that she had gone to the amusement park with her sons and may have had a chance encounter with the victim's sister. She further stated that her son had seen the victim's sister at the park, but that she had not.
The probation officer testified that he had previously instructed Dunaway that if there were ever any chance encounters with the victim or his family, she was to leave the location, tell someone who could later be identified as a witness, and telephone him immediately.
At the conclusion of the hearing, the trial court found Dunaway guilty of violating the condition of community control that prohibited her from having contact with the victim's family. The trial court sentenced Dunaway to a maximum prison term of eighteen months. In this appeal, she now raises three assignments of error for review.
In her first assignment of error, Dunaway argues that the trial court misled her as to the maximum penalty for menacing by stalking and, therefore, that her plea was not voluntary within the meaning of Crim.R. 11(C). We find this assignment of error to be without merit.
Our review of the record reveals that Dunaway never appealed from her original conviction and sentence. Had she pursued such an appeal, it would have provided her with the appropriate means of redress for challenging her guilty plea. Dunaway cannot now collaterally attack her underlying plea and conviction when she is appealing from the revocation of her community control.[1] As a result, her first assignment of error is without merit.
In her second assignment of error, Dunaway contends that the state presented insufficient evidence to sustain a finding that she had violated a condition of her community control. Although she agrees that the condition in question prohibited her from having contact with the victim or any member of his family, she argues, in essence, that her contacts were not contacts "in the true meaning of the word," but were merely coincidental. She further argues that she provided the trial court with reasonable explanations for the contacts. We disagree.
In order to support the revocation of a community-control sanction, the state does not need to adduce proof beyond a reasonable doubt.[2]
Rather, the quantum of evidence supporting the revocation must be substantial.[3] The trial court then has the discretion to determine whether to revoke an offender's community-control sanction.[4]
In the present case, the trial court listened to the testimony of Dunaway and her oldest son. It also heard testimony from the victim's mother and sister describing their contacts with Dunaway. Testimony from the state's witnesses established that Dunaway had made contact with the victim's family three times in two days. In each instance, the victim's family members testified, Dunaway was physically present within several feet of them and made direct eye contact with them. Moreover, each contact occurred shortly after Dunaway had been released from her ten-day term at the justice center.
The trial court found that the timing of Dunaway's actions supported the state's argument that the meetings were not coincidental. The state presented testimony from Dunaway's probation officer that Dunaway was released from the justice center on June 14, 2001, and taken off a jurist monitor device on June 17, 2001. The very next day, June 18, 2001, Dunaway asked for permission to go to the amusement park. Then on June 20, 2001, Dunaway appeared at two locations where the victims' family was present. She then appeared the next day in proximity to the victim's sister at the amusement park, despite the size of the park and the large number of people in attendance. The trial court found that the contacts were too close in time and began too soon after Dunaway had been released from the justice center to be coincidental.
Here, the trial court was presented with two versions of the events. Clearly, the trial court was in the best position to judge the credibility of the witnesses and the weight to be given to the evidence.[5] The court stated that it believed the state's witnesses. Based upon our review of the record, we conclude that there was substantial evidence from which the trial court could have concluded that Dunaway had violated the terms of her community-control sanction. Because the trial court's decision was not an abuse of discretion, we overrule the second assignment of error.
In her third assignment of error, Dunaway argues that the trial court erred in imposing the maximum prison term because it did not make the statutorily required findings and provide its reasons for those findings. We agree.
When an offender violates the conditions of community control, a trial court has three options under R.C. 2929.15(B). It can lengthen the term of the community-control sanction, impose a more restrictive community-control sanction, or impose a prison term on the offender. If the trial court imposes a prison term upon the offender, the term imposed must be within the range of prison terms available under R.C. 2929.14, and it must not exceed the prison term specified in the notice provided to the offender at the original sentencing hearing.[6]
Our review of the record reveals that the trial court notified Dunaway at her original sentencing that she could be subject to an eighteen-month prison term if she violated the conditions of her community control. After finding that Dunaway had violated the conditions of her community control, the trial court imposed the maximum prison term. In doing so, the court partially complied with R.C. 2929.15(B), because Dunaway's sentence was within the available range of prison terms and did not exceed the term previously specified by the court.
The trial court, however, failed to comply with the felony sentencing guidelines when it imposed the maximum prison term. Under R.C. 2929.15(B), the prison term imposed after the violation of a community-control sanction must comply with R.C. 2929.14. Under R.C. 2929.14(C), a trial court shall not impose the maximum sentence unless it makes one of the following findings: (1) that the defendant has committed the worst form of the offense; (2) that the defendant poses the greatest likelihood of committing future crimes; (3) that the defendant is a repeat violent offender; or (4) that the defendant is a major drug offender.[7] The trial court must also state on the record the reasons supporting its finding.[8] Because the trial court here did not make any specific findings or give any explanations indicating that Dunaway satisfied the criteria in R.C. 2929.14(C), its imposition of the maximum sentence was improper. The sentence imposed was contrary to law and was not supported by the record.[9] Accordingly, we sustain Dunaway's third assignment of error, vacate the sentence, and remand this cause to the trial court for resentencing so that the court can make the statutorily required findings and provide reasons for those findings. In all other respects, the trial court's judgment is affirmed.
Judgment affirmed in part, sentence vacated, and cause remanded.
Painter, P.J., and Hildebrandt, J., concur.
[1] See State v. Clark (Dec. 31, 1996), 1st Dist No. C-960103; Statev. Stokes (Nov. 2, 2001), 6th Dist. No. WD-00-070; State v. Freshwater
(June 26, 1998), 11th Dist. No. 97-L-218.
[2] See State v. Mingua (1974), 42 Ohio App.2d 35, 327 N.E.2d 791.
[3] See State v. Hylton (1991), 75 Ohio App.3d 778, 600 N.E.2d 821.
[4] See State v. Tranter (Mar. 26, 2001), 12th Dist. No. CA2000-05-035.
[5] State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.
[6] See R.C. 2929.15(B)(5).
[7] R.C. 2929.14(A)(C).
[8] R.C. 2929.19(B)(2)(d); State v. Edmonson, 86 Ohio St.3d 324,328-29, 1999-Ohio-110, 715 N.E.2d 131.
[9] See R.C. 2953.08(G)(1).